UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

UNITED STATES OF AMERICA,

                                              Ind. No. 14-CR-359 (CM)

        v.


RUDOLPH DAVID,

                    Defendant.

-------------------------------X




**SENTENCING MEMORANDUM**




Edward V. Sapone, Esq.
Edward V. Sapone, LLC
*Attorney for Defendant*
*Rudolph David*
40 Fulton Street, 23rd Floor
New York, New York 10038
Telephone: (212) 349-9000
Facsimile: (212) 349-9003
E-mail: edward@saponelaw.com

# TABLE OF CONTENTS

**Page**

I.   Introduction....................................... 1

II.  An Overview of Sentencing Post-*Booker*............. 2

III. History & Characteristics, and Nature
     & Circumstances of the Offense (§3553(a)(1))....... 3

     a.  *History & Characteristics*................... 3

         i.   *Childhood*............................. 3

         ii.  *Work History*.......................... 4

         iii. *Family Tragedies*...................... 8

         iv.  *Responsible Son and Father*............ 9

     b.  *Nature & Circumstances*
         *of the Offense*............................ 13

     c.  *Mr. David's Poor Health is a*
         *Characteristic That Merits Consideration*
         *for a (§3553(a)(1)) Variance*................ 14

VI.  Remaining Factors of 18 U.S.C. § 3553(a).......... 16

     a.  *The Need for the Sentence Imposed*
         *to Reflect the Seriousness of the*
         *Offense, to Provide Just Punishment*
         *for the Offense, and to Avoid*
         *Unwarranted Sentence Disparities*
         *(§3553(a)(2)&(6))*.......................... 16

     b.  *The Need to Provide Adequate Deterrence*
         *To Criminal Conduct and Protect the*
         *Public from Further Crimes of*
         *Defendant David (§3553(a)(2))*.............. 20

VII. Conclusion........................................ 24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007) ..........................................2

*Nelson v. United States*,
   129 S.Ct. 890 (2009) ........................................2

*United States v. Booker*,
   543 U.S. 220 (2005) .........................................2

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) .................................2

**Statutes**

18 U.S.C. §3553(a).........................................*passim*

21 U.S.C. §841(b)(1)(c).........................................1

21 U.S.C. §846.................................................1

U.S.S.G. §2D1.1................................................1

U.S.S.G. §3E1.1................................................1

**Other Authorities**

Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O.
   Wikstrom, "Criminal Deterrence and Sentence Severity: An
   Analysis of Recent Research," Oxford: Hart Publishing (1999) 20

 "Interactive Sourcebook of Federal Sentencig Statistics,"
   United States Sentencing Commission (2013) ..............19, 20

Valerie Wright, Ph.D., "Deterrence in Criminal Justice," The
   Sentencing Project (November 2010) .........................20

## I.   Introduction

We offer this memorandum to the Court for Defendant Rudolph David in advance of his sentencing hearing, scheduled for April 7, 2015, at 4:00 p.m.

Mr. David will be sentenced upon his acceptance of responsibility to Count One of Superseding Information S1 14-CR-359, which charges him with conspiracy to distribute and possession with the intent to distribute cocaine and heroin, in violation of 21 U.S.C. §§841(b)(1)(C) and §846.

We ask the Court to begin its analysis, consistent with Mr. David's plea agreement (*see* Exhibit A), and the Probation Office's calculations:

| | |
|---|---|
| Base Offense Level for at least 500 grams but less than 2 kilograms of cocaine [U.S.S.G. §2D1.1(c)(1)] | 24 |
| Timely Acceptance of Responsibility [U.S.S.G. §3E1.1] | -3 |
| Adjusted Offense Level | 21 |

Advisory Guidelines Range: 41 to 51 months incarceration.

We respectfully suggest, however, that a Guidelines sentence would be "greater than necessary" to achieve the objectives of 18 U.S.C. § 3553(a). Instead, we ask the Court to find that a four-level variance and a sentence of 28 months incarceration satisfies the parsimony clause.[1]

---

[1] Mr. Rudolph's plea agreement allows for our request for a downward variance.

## II.  An Overview of Sentencing Post-*Booker*

Since 2005, district courts have had wide discretion to impose non-guidelines sentences that are reasonable. *See United States v. Booker*, 543 U.S. 220, 226-227 (2005). The guidelines "are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2009). They are "effectively advisory," *see Gall v. United States*, 552 U.S. 38, 62 (2007), and are only "the starting point and the initial benchmark."  *Id.* at 49.

The district court must "conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense."  *United States v. Cavera*, 550 F.3d 180, 184 (2d Cir. 2008).

Of course, the overarching goal of sentencing is to ensure that a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing.

Ultimately, the Court must consider:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed to: (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide

2

the defendant with needed
educational or vocational
training, medical care, or other
correctional treatment in the most
effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentences and the
sentencing range established for:
(A) the applicable category of
offense committed by the
applicable category of defendant
as set forth in the guidelines;

(5)   any pertinent policy statement
[...];

(6)   the need to avoid unwarranted
sentence disparities among
defendants with similar records
who have been found guilty of
similar conduct; and

(7)   the need to provide restitution to
any victims of the offense.

18 U.S.C. §3553(a)(1)-(7).

### III. History & Characteristics, and Nature & Circumstances of the Offense (§ 3553(a)(1))

*a.   History & Characteristics*

   *i.   Childhood*

Mr. David is 39 years of age. He was born on November 7, 1975, in the Bronx, New York. When Mr. David was a year old, his parents separated. His father would visit once a month, and contributed $100 to supplement the social security income his mother received, and on which she raised not only Mr. David, but also his four siblings.

3

To say that Mr. David grew up in poor economic conditions is an understatement; his parental oversight was equally lacking. Mr. David's mother was overwhelmed trying to care for five children, and his father was rarely around.

When Mr. David reached school age, he had no one to help him with his studies, and plagued by a panoply of learning disabilities, Mr. David struggled in school. Despite attending special education classes throughout middle and high school, Mr. David was forced to twice repeat the 12th grade. Eventually, he dropped out of school, as he was unable to pass the standardized tests required to graduate.

*ii.  Work History*

Upon dropping out of school, Mr. David was confronted with powerful negative influences. He had no father figure, no guidance from his mother, his older siblings had embarked on the wrong path, and the streets of his Bronx neighborhood were flooded with drugs and violence. But Mr. David was a good kid, and for a time was able to resist these demons. He tried to find a job, but without a high school diploma, or any employable skills, his prospects were slim. Eventually he was able to gain part-time work as a stock boy at the grocery store across the street from his mother's home.

Mr. David's learning disabilities and poor communication skills contributed to a rough time at work; his bosses and co-workers were often frustrated, which led to Mr. David being treated poorly. While he was humble and knew how to follow directions, he found himself in a stressful, frustrating, and unsatisfying work environment. Despite his negative experience, Mr. David persisted at the grocery store for two years, until he was able to find work packing and shipping clothes for Carlisle Collection, a women's clothing company on West 55th Street.

For a time he was happier, but eventually the same issues that had presented themselves at his previous job began to reoccur. Mr. David, who was struggling with undiagnosed depression and anxiety, worked at Carlisle Collection for approximately four years until the stress he experienced at work and his penchant for self-medication got the better of him.

Around that time, Mr. David's mother was diagnosed with colon cancer, and following a botched surgery, was fighting for her life while facing mounting medical costs. Mr. David, who was in a dark place mentally and emotionally, and who needed money to help his mother, sold drugs and was caught. He accepted responsibility and was sentenced to 1 to 3 years in New York State prison.

Mr. David was a model inmate; he served eleven months and one month of work release, the minimum time on his sentence, before being released to parole, which he successfully completed.

Following his release, Mr. David tried to get back on the right path. In 2004, Mr. David gained employment with Strauss Auto Parts, not far from his home in the Bronx. For two years, he worked as a customer service representative. When the store went out of business, Mr. David was able to find another job at a small hardware store on Webster Avenue in the Bronx. From 2006 to 2008, Mr. David worked making keys, stocking shelves and working the cash register for the small neighborhood store.

In 2009, Mr. David went to work for Best Buy Automotive, also located in the Bronx. For nearly five years, Mr. David worked as a customer service clerk, writing work orders for vehicles, ordering parts and helping customers.

Shortly before his arrest in this case, the ownership of Best Buy changed hands. After his arrest on January 29, 2014, Mr. David was released on a bond; he asked his boss if he could return to work and he was told that he could return only as an "off-the-books" employee. Mr. David decided to look elsewhere for work.

A few months later, he secured a position as a plumber for Trade Star Plumbing, located in Pelham, New York, a job he held for three months in the spring of 2014. Mr. David, a non-union worker, was laid off, however, after requested a pay increase.

While unable to secure other employment over the last nine months, Mr. David has kept busy while on home detention with electronic monitoring. He completed an online course with the Occupational Safety and Health Administration (OSHA) in July 2014 (*see* Exhibit B), a necessary step in applying for membership in the plumbers union, which he intends to do at the conclusion of the case.

Mr. David also completed applications at:
- Montefiore Medical Center;
- a cemetery;
- various construction companies; and
- Home Depot.

Home Depot recently brought Mr. David in for two interviews. After drug testing and a background check, on March 13, 2015, Mr. David was offered a position as a Freight Team Associate at their New Rochelle location. (*See* Exhibit C). He has completed two weeks of paid orientation and received his apron and rule book. He will be working

the overnight shift from 9pm to 6am, and is waiting to receive his schedule for the upcoming weeks.

Despite his lack of education and training, Mr. Rudolph has done his best to work, albeit in entry-level positions, for the better part of the last ten years.

### iii.   Family Tragedies

Compounding his struggles in school, where he battled learning disabilities, and the hurdles he has faced at his various jobs, Mr. David's life has been marked by tragedy: three of his four siblings suffered traumatic, sudden deaths.

Mr. David's mother, Zenaida Silva, had five children with four different fathers. All five children were raised by Ms. Silva with little or no help. The children often were left to fend for themselves and each other. As a result, Mr. David was closely bonded to each of his brothers and sisters.

In 1983, at the age of 21, Mr. David's brother Tito Martinez was shot to death. In 1989, at the age of 29, Mr. David's sister Rosie Martinez was beaten to death by unknown assailants with a baseball bat. And in 2010, at the age of 49, Mr. David's sister Teresita Santiago died of complications from a life-long addiction to heroin, methadone and prescription pills.

Mr. David still drives his mother once a month to Rosedale cemetery in Elizabeth, New Jersey, where all three of his siblings are buried. They are the only two that ever visit.

iv.   *Responsible Son and Father*

Having experienced such devastating loss, Mr. David is keenly aware of the importance of cherishing his remaining family. Over the past several years, he has dedicated much of his time caring for his mother, who is 75 years of age.

In 2001 Ms. Silva was diagnosed with colon cancer. Later that year she had surgery to remove the cancerous tumor. As a result of surgical error, Ms. Silva developed a life threatening infection. After several additional surgeries, she was forced to wear a colostomy bag for a year. Three resulting hernias then required another surgery and months of intensive rehabilitation.

Mr. David was her only support: "My son was the only one there for me. He attended all appointments with me and stood by my side through it all." (Exhibit D).

Mr. David continues to support his mother as she suffers with kidney stones, lymphadenopathy (swelling of the lymph nodes), osteoarthritis, hypertension, a herniated disc in her back, and tendinitis. (*See* Exhibit E).

Ms. Silva suffered kidney failure several years ago and lost a kidney. She endures painful kidney stones in her

remaining kidney, typically requiring either shock wave or laser treatments to break up the stones. (*See* Exhibit E). She must be checked regularly by her doctors to avoid further damage to her kidney, which could require dialysis.

As a result of the herniated disc in her back, Ms. Silva suffers numbness in her left leg and hand which requires ongoing physical therapy.

She is on a litany of medications, including:

- Glipizide ER (lymphadenopathy);

- Norvasc (hypertension);

- Lisinopril and Atenolol (hypertension);

- Pantoprazole (acid buildup in stomach);

- Metformin (Diabetes);

- Urocit-K (kidney stones); and

- Vicodin or Percocet as needed for pain from the kidney stones.

(*See* Exhibit E).

Ms. Silva relates that she is "still going to doctors appointments and my son is the one who takes me and brings me back." (Exhibit D). Mr. David also helps her with shopping, medications, cleaning and fixing things around the house.

Ms. Silva describes her son as "humble, respectful, loyal, loving and most of all [a] great father and son." (Exhibit D).

10

Mr. David is also a supportive father. He has three biological children, and maintains a strong relationship with all of them. His oldest, Migdalia, age 18, a senior in high school who is applying to colleges, lives with her mother in Middletown, New York. She and Mr. David speak frequently, and she stays with him regularly.

R█████ D█, ███, age 7, resides in Hunts Point, Bronx, with his mother. Before Mr. David's home confinement, the two visited multiple times a week. Mr. David routinely picked him up from school and took him to the park. Now, Mr. David has a scheduled visit with his son every Thursday; he helps his son with his homework, and the two play at Mr. David's home.

Mr. David's youngest, Y█████, age 4, lives in Puerto Rico with her mother. Before his period of home confinement, Mr. David would try to travel once a month to Puerto Rico to visit his daughter, or she would come to New York. Now, they frequently facetime, and she has stayed with Mr. David in New York during several extended trips over the last year.

Jennifer Acosta, Y█████'s mother, describes Mr. David as "a responsible person with his parental duties, and […] loving with his daughter. He forms an essential part in the life of his daughter, because he is a good father and she loves him a lot." (Exhibit F).

In addition, Mr. David is a caring stepfather to his fiancé Zugey Maestre's four children, ages 13, 10, 8, and 7. Before his home confinement, Mr. David picked the children up from school. He still helps them with their homework, and watches them after school. Mr. David has been instrumental in the lives of Ms. Maestre's two boys, J█ and Y█████ (10 and 8), who are both in special education classes.

Mr. David's commitment to family, and in particular to the children, is echoed throughout the letters to the Court.

Ms. Maestre describes Mr. David as a "great father and stepfather. He care[s] so much about his kids and my kids love him like a father." (Exhibit G).

Evelyn Gomez, who has known Mr. David for the past 12 years, describes him as a "caring, supporting, and responsible father[…]." (Exhibit H).

Sanford Tanner, who met Mr. Rudolph working with him at Tradestar Plumbing in 2014, observed of Mr. David that, "he loves his kids, and when he would talk to them you can see that he has a lot of compassion for them[…]." (Exhibit I).

Enrique Maestre Vega, Mr. David's fiancé's father, has gotten to know Mr. Rudolph well over the past five years. He attests that Mr. Rudolph "really loves his kids he

talked about them so much, and also cares very much about my grandkids[...]." (Exhibit J).

Recent and not-so-recent studies show that children suffer severe and far-ranging consequences by the absence of their father while growing up. *See* Cynthia C. Harper, Sara S. McLanahan, Father Absence and Youth Incarceration, 14 JRA 369-397 (2004). Having experienced the pain of missing his biological father during much of his childhood, Mr. David has vowed to be a better father to his and his fiancé's children.

Mr. David is a dedicated son, partner and father. While he has no education or skill set to speak of, Mr. David has worked towards establishing consistent employment so he can continue providing for his children. He is committed to rehabilitating himself by continuing to focus on family and building a productive, law-abiding life.

b. *Nature and Circumstances of The Offense*

As part of the conspiracy, on August 14, 2013, Mr. David sold the confidential informant 100 grams of cocaine, and the following month on September 10, 2013, Mr. David sold another 100 grams of cocaine and 20 bundles of heroin.

Having served eleven months in state prison for criminal sale of a controlled substance, and having taken steps to put his past mistakes behind him, the last choice

Mr. David should have made was to engage in a narcotics conspiracy. He is the first to admit that his misconduct was illegal and wrong.

Mr. David will turn 40 years of age this year. He is responsible for his children and has assumed the responsibility of his fiancé's children. He is also responsible for his mother. Mr. David is focused, and is receiving the help he has needed all along. Plainly put, Mr. David is sorry for his misconduct and is intent on never again straying from the law.

c.   *Mr. David's Poor Health is a Characteristic that Merits Consideration for a (§3553(a)(1)) Variance*

Although we are not requesting a downward departure, we ask the Court to consider a downward variance under §3553(a)(1) (characteristics) and §3553(a)(2) (specific deterrence and punishment), based on the vulnerability Mr. David will face in prison due to his poor health.

Mr. David suffers from kidney stones, renal colic (extreme pain in lower back or sides), hypertension (high blood pressure), and transaminitis (elevated liver enzymes). (*See* Exhibit K). According to New York Presbyterian Hospital, there is usually a great deal of pain when a stone passes from the kidney down the tube (ureter) to the bladder. Kidney stones that block the ureter completely can cause permanent damage to the

14

kidneys. Surgery or lithotripsy (a procedure which involves the use of a laser or electric shock waves) is often necessary to break up larger stones. Treatment of kidney stones usually requires pain medication.

Mr. David already has required hospital care and IV fluids. He is prescribed a bevy of medications, including:

- Tamsulosin 0.4mg (kidney stones);

- Hydrocodone/Percocet (as needed for pain from kidney stones);

- Levofloxacin 500mg (broad spectrum antibacterial);

- Ibuprofen 600mg (as needed for pain from kidney stones);

- hydrochlorothiazide (high blood pressure);

- Lisinopril (high blood pressure);

- Omeprazole (heart burn);

- Cholecalciferol (vitamin D deficiency); and

- Imiquimod.

(*See* Exhibit K).

Medication and a proper diet are critical to minimizing the risks associated with kidney stones. (*See* Exhibit K). Mr. David's access to the proper diet and medications, not to mention timely and diligent medical care, in the BOP, respectfully, likely will be strained.

### IV.  Remaining Factors of 18 U.S.C. § 3553(a)

*a.  The Need for the Sentence Imposed to Reflect the
    Seriousness of the Offense, to Promote Respect for
    the Law, to Provide Just Punishment for the Offense,
    and to Avoid Unwarranted Sentence Disparities
    (§ 3553(a)(2)&(6))*

As the Court reflects upon the person being sentenced, I urge Your Honor to consider that a downward variance to a sentence of 28 months will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities.

Mr. David has struggled with anxiety and depression during various periods in his life. In the past, he would self-medicate, turning to alcohol and drugs. This only contributed to Mr. David making poor choices.

While these circumstances in no way excuse the instant offense, they place it into context, and help to explain how a person who has so many good qualities can make the poor choices Mr. David made. But he is determined to rehabilitate himself, and has already made great strides towards being a better man, partner, father, and role model.

Mr. David has proven his value to a society of people that, notwithstanding his misconduct, admires and supports him.  The community testimonials written to the Court demonstrate that the requested non-guidelines sentence will promote respect for the law and provide just punishment.

Mr. David's fiancé describes him as "helpful, caring, loyal, humble, loving and friendly." (Exhibit G). She also shares that at a time when she believed her life was coming to an end, and Mr. David "was the only one there cheering me on and not letting me give up." (Exhibit G).

Ruth Cotto, who has known Mr. David for the past 9 years, says of him: "he's a very big, kind hearted individual. He's very understanding and generous. He's also been an excellent male figure in my son's life (Age 7)." (Exhibit L). "Our friendship really bloomed about 5 years ago, when my ex-husband and myself were separating […]. Mr. David helped me find an apartment for my son and I." (Exhibit L).

Chavon Henry has known Mr. David for more than seven years: "Over the years he has proven to be a very responsible person and family man, who could be called upon at any time to help out whenever the need arose. He is also very respectful and liked by all the neighbors." (Exhibit M).

Mindy Plaza who has known Mr. David for the last ten years, writes:

> He is a positive, calm, humble person who takes care of everyone else and likes to see everyone around him happy. He possesses so many positive qualities. He puts his family first, he is a loving man and father. Not only to his own family but to mine as well.

(Exhibit N).

Tanya and Jorge Zapata, who have been close to Mr. David for more than 20 years, share that Mr. David "is an extremely kind person […]. Despite Rudolph's past, […] [we] believe beyond a doubt, that given the opportunity, Rudy will […] excel[…]." (Exhibit O).

Judith Olmeda, who has been a friend of Mr. David's for more than 10 years writes:

> I can confirm that [Mr. David] is a man of great integrity and is extremely dedicated to his family and passionate about his work and is always ready to help others.

(Exhibit P).

Evelyn Gomez, who has known Mr. David for the past 12 years, describes him as a "loving, very attentive, and helpful son […] [and] a caring, supportive and responsible father as well." (Exhibit H).

In addition to the above-quoted individuals, other members of the community have submitted letters requesting the Court's leniency when considering Mr. David's sentence. (*See* Exhibit Q).

All of these people know how serious this case is. They also know that the law carries the power to punish Mr. David by imposing a Guidelines sentence if necessary; yet they urge the Court to consider a lenient sentence, given

all that Mr. David has done for the children, his mother, family and friends.

There is no doubt that since this case began more than a year and a half ago, Mr. David has been taught a valuable lesson. It is obvious to all who know him that he does not need to be incarcerated for a Guidelines term to be punished or deterred; nor would the requested sentence result in a disparity in sentencing. An evaluation of the United States Sentencing Commission's Sourcebook of Federal Sentencing Statistics for Fiscal Year 2013 is revealing in this regard.

Of the 1,525 defendants sentenced in the Southern District of New York in fiscal year 2013, only 451 (29.6%) received a within-the-Guidelines sentence, while 644 (42.2%) received sentences below the Guidelines minimum sentence based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit R).

An analysis of the 22,230 defendants sentenced nationwide for drug trafficking offenses last year, reveals that only 38.8% received sentences within the Guidelines range, while more than 60% received below-guidelines sentences. (*See* Exhibit R).  For those drug trafficking defendants sentenced below the Guidelines minimum, the median decrease based solely on *Booker* and § 3553(a) was a 31% downward reduction. (*See* Exhibit R).

Therefore, a sentence of 28 months would not represent a disparity in sentencing, but instead would represent roughly the median 31% downward reduction, a sentence within the range of reasonable sentences that many thousands of similar defendants in similar cases have received.

b.   *The Need to Provide Adequate Deterrence To Criminal Conduct and Protect the Public from Further Crimes of Defendant David (§3553(a)(2))*

There is no empirical data that proves that the imposition of a prison sentence accomplishes general deterrence.[2]  Nonetheless, the requested sentence will demonstrate that engaging in illegal conduct will not be tolerated. It will send a message that not only can a defendant be under the confines of home detention with electronic monitoring for fourteen months, but he will then be subjected to years in federal prison.

In addition, Mr. David has been specifically deterred since January 29, 2014, while on home detention; he will be similarly deterred while in prison; and he will continue to

---

[2] Valerie Wright, Ph.D., "Deterrence in Criminal Justice," The Sentencing Project (November 2010); http://www.sentencingproject.org/doc/ deterrence%20briefing%20.pdf ("...the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects") quoting Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom, "Criminal Deterrence and Sentence Severity: An Analysis of Recent Research," Oxford: Hart Publishing (1999).

be deterred for at least three years while on supervised release.

Nonetheless, I believe given what we know of Mr. David that he will not re-offend, and does not need to be specifically deterred.

Research by American social scientists shows that all but the most exceptional criminals, mature out of lawbreaking before middle age. (*See* Exhibit S).

And for the first time in his life, Mr. Rudolph is receiving proper medication for his anxiety and depression. Dr. Fred Pelzman recently prescribed Mr. David Sertraline Hcl 50mg (*see* Exhibit T), and Mr. David already is experiencing the positive impact that proper treatment can have. For the first time, Mr. David has an alternative to years of self-medication, which contributed to his impaired cognition and poor past decisions.

Additionally, Mr. David has immense support from the community.

Daisy Gonzalez, the mother of Mr. David's partner, describes him as "a great man, responsible, […] caring, honorable […]. He is always attentive with his daughter, taking care of his family and especially his sick mother. In my heart I feel that Rudolph is no threat to […] society." (Exhibit U).

Sanford Tanner writes: "No doubt Rudy has made mistakes, but I think he has a good core and is moving forward to do things in a law abiding way." (Exhibit I).

Tanya Zapata, a social worker, states that she and her husband "are more than willing to provide Rudolph with every aspect of support, guidance, accountability and love." (Exhibit O). Ms. Zapata believes that, if given a second chance, Mr. David will be a "good citizen." (Exhibit O).

Enrique Maestre Vega, the father of Mr. David's fiancé, shares that Mr. David is "a very nice and loyal man[,] a good father[, and] has lots of positive qualities." (Exhibit J).

And, Louis Rivera, who has known Mr. David for more than 20 years, believes that while "Rudolph has made poor life choices in the past, […] his willingness to rectify his mistakes[] demonstrates his maturity and eagerness to better himself and his family." (Exhibit V). According to Mr. Rivera, "[i]f anyone deserves to be given the chance to start a new beginning, I highly recommend that it […] be someone like Rudolph, who possesses the support and guidance of reputable family and friends." (Exhibit V).

With the help of a community of good people who strongly support him, Mr. David can continue to contribute to society. He is a man who has battled many personal

challenges: he was raised in a violent neighborhood; his mother could not adequately financially or emotionally support her five children; Mr. David lacked a positive male role model; his siblings served as poor role models; three of his siblings were killed or died from addiction; Mr. David suffered anxiety and depression; and he lacked the education and skills to succeed. Notwithstanding these hardships, Mr. David has done his best to work and be a good father, son, and friend.

I suggest that given Mr. David's remorse, self-rehabilitation, focus on his mental health, and commitment to his family, that he is not likely to reoffend.

## V.    Conclusion

On behalf of Mr. David and his community, I thank the Court in advance for taking the time to consider our sentencing submission. We look forward to addressing the Court during the sentencing hearing on July 28, 2014.

Dated: New York, New York
       March 24, 2015

Respectfully submitted,

*/s/ Edward V. Sapone*
Edward V. Sapone
Counsel for Defendant
Rudolph David

cc:  A.U.S.A. Kan Min Nawaday
     P.O. Tandis Bruno